Rebecca S. Widen, SBN 219207
Andrea A. Najor, SBN 221853
HAAPALA, THOMPSON & ABERN, LLP
1939 Harrison Street, Suite 800
Oakland, California 94612
Tel:   510-763-2324
Fax:   510-273-8570

Attorneys For Defendants
COUNTY OF SAN JOAQUIN, ANDY CORONADO,
BRIAN FRANKS, LUPE GARCIA, THOMAS KENDRICK,
JULIE ANEMA, RONALD ZALUNARDO, and RON COPLIN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO

| | |
|---|---|
| SOFIA DAVILA; RUBI PASTORA, JEANETTE ECHEVERRIA; GUILLERMO DAVILA; MAYRA SANDOVAL; EDWIN JAVIER DAVILA; JUAN DAVILA; and MAYLIN DAVILA,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN JOAQUIN; CITY OF TRACY; and DOES 1 through 50,<br><br>Defendant. | Case No.:  2:06-CV-02691-LKK-EFB<br><br>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SAN JOAQUIN COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION**<br><br>**Date:       July 25, 2008**<br>**Time:       10:00 a.m.**<br>**Courtroom:  4, 15th Floor**<br><br>**Trial Date:  January 27, 2009** |

Defendants COUNTY OF SAN JOAQUIN, ANDY CORONADO, BRIAN FRANKS, LUPE GARCIA, THOMAS KENDRICK, JULIE ANEMA, RONALD ZALUNARDO, and RON COPLIN ("County Defendants") herein submit their statement of undisputed facts in support of their motion for summary judgment:

| **STATEMENT OF UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 1. On March 4, 2006, Guillermo Davila, a 71-year old resident of Tracy, California, was arrested by the Tracy Police Department and charged with public intoxication. Mr. Davila was transported to the San Joaquin County Jail for booking and detention. Upon arriving at the jail, the arresting officer filled out a booking report providing certain information about Mr. Davila. The booking report stated Mr. Davila's name, | Widen Dec., Ex. 1 |

1

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | |
|---|---|
| address, date of birth, social security number, and physical description. It stated that he had been arrested and charged with public intoxication after he was found inside a neighbor's residence, under the influence of alcohol, and unable to care for himself. It also stated that he was not injured, was not armed, was not resistive, and was not a habitual user of narcotics. | |
| 2. The arresting officer slid the booking report through the booking window, along with a plastic bag containing the property he had removed from Mr. Davila's person (wallet, keys, belt, and comb). Mr. Davila then entered into the pre-book area of the booking department, and the arresting officer left the premises. | Widen Dec., Ex. 1; Ex. 2 |
| 3. Other than the information provided in the booking report, San Joaquin County Jail officials had no knowledge of Mr. Davila's background, his behavior earlier that evening, or the conduct that precipitated his arrest. | Widen Dec., Ex. 1 |
| 4. All arrestees entering the San Joaquin County Jail go through a process called "pre-book" immediately upon their admittance into the jail. During pre-book, the arrestee is patted down and searched for contraband by a correctional officer. After that, the information received from the arresting officer's booking report is entered into the statewide CJIS computer system. The CJIS computer system then generates a series of screens that contain questions for the pre-book officer to ask the arrestee concerning his health. The pre-book officer enters the answers directly into the computer. The pre-book officer also enters his own observations of the arrestee. Finally, the arrestee's booking photograph is taken, and he is either placed in a holding cell, or directed to take a seat in the booking lobby while his or her paperwork is processed. | Widen Dec., Ex. 2 |
| 5. Mr. Davila was admitted into the jail and pre-booked at approximately 7:30 p.m. by the pre-book officer on duty, Thomas Kendrick. Mr. Davila stood cooperatively while Officer Kendrick conducted a pat search and found no | Widen Dec., Ex. 3, pp. 27, 41, 46-56, 75-78; Ex. 4 |

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | | |
|---|---|---|
| 1, 2, 3, 4 | contraband. Officer Kendrick then entered the information from Mr. Davila's booking report into the CJIS system, and asked Mr. Davila the series of standardized health screening questions that appeared on the screen. | |
| 5–10 | 6. Mr. Davila denied having any of the listed medical conditions, including diabetes or high blood pressure. Mr. Davila denied being under the care of a doctor, and denied taking any pills or mediations. Mr. Davila indicated that he did regularly use alcohol, and that the last time he used it was "today." Officer Kendrick could not ascertain what kind of alcohol Mr. Davila had been drinking, so he marked "unknown" for that portion of the questionnaire. | Widen Dec., Ex. 3, pp. 27, 41, 46-56, 75-78; Ex. 4; Ex. 36, p. 30 |
| 11–21 | 7. Officer Kendrick also recorded his physical observations of Mr. Davila in the computer system. He observed that Mr. Davila was awake, alert and responsive to questions. Mr. Davila appeared to be under the influence of alcohol, but he showed no signs of bizarre, suicidal or confused behavior. Mr. Davila had no visible signs of trauma, wounds, illness, or unusual skin conditions. Officer Kendrick testified that he could not recall all of the objective signs and symptoms of intoxication that he observed in Mr. Davila that evening. In general, he recalled that Mr. Davila did not appear to be "sloppy drunk," but that Mr. Davila had the relaxed posture and mannerisms of someone who had been drinking. He also recalled that Mr. Davila was polite and cooperative. | Widen Dec., Ex. 4; Ex. 3, 75-78 |
| 22–24 | 8. At the conclusion of the pre-book health screening, Officer Kendrick checked a box on the computerized form which caused Mr. Davila's health screening information to be transmitted to a nurse for review. | Widen Dec., Ex. 4; Ex. 3, p. 33, 51 |
| 25, 26 | 9. It was evident to Officer Kendrick that Mr. Davila's first language was Spanish. | Widen Dec., Ex. 3, p. 23, ll. 9-13; pp. 50-51 |
| 27 | / | |
| 28 | / | |

3

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | | |
|---|---|---|
| 10. | Officer Kendrick was able to communicate effectively with Mr. Davila during the pre-book process because Mr. Davila also spoke English, and Officer Kendrick knew the Spanish words for key portions of the health screening questions. | Widen Dec., Ex. 3, p. 23, ll. 9-13; pp. 50-51 |
| 11. | Officer Kendrick testified he would have summoned the Spanish-speaking officer on duty in booking (at that time Officer Guadalupe Garcia) to interpret the pre-book questions if he felt he was unable to communicate with Mr. Davila, as that was his standard practice in those situations. | Widen Dec., Ex. 3, pp. 20-21 |
| 12. | In Mr. Davila's case, he did not feel an interpreter was necessary because Mr. Davila understood and responded appropriately to the questions he asked. | Widen Dec., Ex. 3, p. 23 |
| 13. | After administering the health screening, Officer Kendrick took Mr. Davila's booking photograph and directed him to take a seat in the booking lobby adjacent to the pre-book area. Officer Kendrick advised Mr. Davila that he could watch television and use the telephones in that area while he was waiting for his paperwork to be processed. Mr. Davila complied and walked without assistance to a seat in the booking lobby. | Widen Dec., Ex. 3, pp. 49-50, 54, 65 |
| 14. | Officer Kendrick took the plastic bag containing Mr. Davila's personal property to the booking desk, and placed it in the appropriate alphabetical bin corresponding with Mr. Davila's last name, to be returned to him at the time of his release. This completed the pre-book portion of Mr. Davila's detention. | Widen Dec., Ex. 3, p. 56 |
| 15. | Arrestees who are released from jail directly out of booking are not routinely seen by a nurse unless they report or demonstrate a medical problem that requires immediate attention while they are waiting for their paperwork to be processed. Medical staff makes the determination of whether an arrestee needs to be seen by medical staff based on the information generated during the medical pre-book screening. Any "yes" answer during the medical pre-book screening requires a nurse to evaluate the | Widen Dec., Ex. 2, at SJC0025, ¶ 6A; Ex. 4 |

4

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | |
|---|---|
| 1. situation and determine whether a medical response is necessary. Mr. Davila's questionnaire contained a "yes" answer to the question of whether he appeared to be under the influence of alcohol. | |
| 16. Registered Nurse Ermelinda Patricio was the on-duty nurse in booking the evening of Mr. Davila's detention. | Widen Dec., Ex. 7, p. 16, ll. 13-15 |
| 17. Nurse Patricio reviewed Mr. Davila's medical screening information after it was transmitted to her by Officer Kendrick via the pre-book computer system. She saw that Mr. Davila was reported to be under the influence of alcohol, but there was no notation that he was experiencing DTs, withdrawal, or any other symptom of alcohol poisoning, which was something that would have been noted by the pre-book officer if it was present. | Widen Dec., Ex. 8; Ex. 7, pp. 40-41 |
| 18. There were no other medical conditions, symptoms, or problems noted during the pre-book medical screening. Nurse Patricio determined that Mr. Davila's condition, as documented during the pre-book screening, did not require any immediate medical intervention. | Widen Dec., Ex. 8; Ex. 7, pp. 21-22 |
| 19. Arrestees like Mr. Davila, who are brought to San Joaquin County Jail on a charge of public intoxication (Ca. Penal Code § 647(f)), are detained for a period of at least six hours to allow them sufficient time to sober up. Most often, if there are no other charges or outstanding warrants, the arrestee is released on his or her own recognizance at the conclusion of the six hour detention. This procedure is in conformance with Title 15 and statewide correctional practice. | Widen Dec., Ex. 5, p. 21-22 |
| 20. Mr. Davila spent his entire six-hour detention seated in the booking lobby. The booking lobby was a large, open area situated directly in front of the booking desk and adjacent to the pre-book area. It contained rows of seats that were occupied by arrestees awaiting the completion of the booking process. The booking lobby had a large, flat-screen television mounted on one wall for the arrestees to watch while they were waiting. On an adjacent wall, there was a | Widen Dec., Ex. 3, pp. 65-66; Ex. 6, pp. 49, 102-107; Ex. 32 |

| | | |
|---|---|---|
| 1<br>2<br>3 | bank of six telephones for the arrestees' unlimited use, which were free of charge for local calls. Collect calls could also be made for long distance numbers by dialing "0." | |
| 4<br>5<br>6<br>7 | 21. Because Mr. Davila was detained in the booking lobby and not a holding cell, his conduct was readily observable at all times by the correctional officers and other staff working in booking that evening. | Widen Dec., Ex. 2 at SJC0013-14; Ex. 3, p. 65; Ex. 6, p. 61 |
| 8<br>9<br>10<br>11<br>12 | 22. Correctional Officer Guadalupe Garcia, a Spanish-speaking officer, had several interactions with Mr. Davila. She first observed Mr. Davila when he was out of his seat in the booking lobby, and she made eye contact with him and said in English that he needed to sit down. He continued to look at her, so she told him more loudly (as she was about 15 feet away) and in Spanish "Sir, you need to have a seat." He complied immediately. | Widen Dec., Ex. 6, p. 102-103 |
| 13<br>14<br>15<br>16<br>17 | 23. On the second occasion, Officer Garcia observed Mr. Davila standing in an area in front of the booking desk and the medical office. Officer Garcia came around from behind the booking desk and greeted Mr. Davila so they were face-to-face. | Widen Dec., Ex. 6, p. 106, ll. 8-13 |
| 18<br>19<br>20<br>21<br>22 | 24. Officer Garcia spoke to him in Spanish, and told him to please take his seat in the booking lobby. Mr. Davila said "okay," and then said in Spanish that he was ready to go home. Officer Garcia told Mr. Davila that she would look up when it was time for him to go. She proceeded to look up his booking information, and then told him he still had four hours to go. Mr. Davila returned to his seat. | Widen Dec., Ex. 6, p. 109-110 |
| 23<br>24<br>25 | 25. Officer Garcia observed Mr. Davila one or more times after that, sitting in the back row of seats in the booking lobby, engaged in conversation with two Hispanic males sitting next to him. | Widen Dec., Ex. 6, p. 72, ll. 3-8, p. 111-112 |
| 26<br>27<br>28 | 26. Mr. Davila approached the booking desk about two hours later with one of the Hispanic males he was sitting with. He inquired again whether it was time for him to go. Officer Garcia checked the | Widen Dec., Ex. 6, pp. 150-151 |

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | |
|---|---|
| status of his booking and told Mr. Davila in Spanish that he had two more hours to go. Mr. Davila responded "okay" and returned to his seat. | |
| 27. Officer Garcia described Mr. Davila as "very nice" and found it strange that he had been arrested on a charge of public intoxication, because his behavior seemed normal during his interactions with her. | Widen Dec., Ex. 6, p. 72, ll. 4-13, p. 74-75, p. 76, ll. 1-13; p. 175, ll. 12-22 |
| 28. Mr. Davila did not seem confused or disoriented at any time. | Widen Dec., Ex. 6, p. 151, ll. 2-5, p. 158, ll. 19-24 |
| 29. She felt she established a good rapport with Mr. Davila after their first face-to-face encounter, and he smiled at her when he spoke to her. | Widen Dec., Ex. 6, p. 74-75 |
| 30. Officer Garcia did not consider Mr. Davila's repeated questions about whether he could go home unusual, because arrestees waiting in the booking lobby frequently ask the officers over and over if it is time for them to leave yet. | Widen Dec., Ex. 6, p. 69, ll. 6-14, p. 162, ll. 13-18, p. 163, ll. 5-16 |
| 31. She felt that Mr. Davila's behavior was consistent with the behavior of a cooperative arrestee waiting in the booking area. | Widen Dec., Ex. 6, p. 163, ll. 12-16 |
| 32. He did not act confused or disoriented in any of his interactions with her. | Widen Dec., Ex. 6, p. 163, ll. 12-16; Ex. 33 |
| 33. There is no evidence that Mr. Davila requested medical attention when he spoke to Officer Garcia or Officer Kendrick, or that he alerted them to any adverse health conditions. Mr. Davila's conduct was compliant, polite and unremarkable. | Widen Dec., Ex. 3, pp. 40-41; Ex. 6, p. 72; Ex. 36, pp. 28-29 |
| 34. When his mandatory six hour detention was up, Mr. Davila was summoned to the booking desk to go through his release paperwork. Mr. Davila got up and walked over to the booking desk when his name was called. | Widen Dec., Ex. 9. p. 50 |
| 35. Correctional Officer Brian Franks processed Mr. Davila's release paperwork. Recognizing that English was not Mr. Davila's first language, he requested Officer Garcia's assistance in translating the release paperwork. | Widen Dec., Ex. 9, pp. 51-52; Ex. 34 |

7

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

| | | |
|---|---|---|
| 36. | Through Officer Garcia, Officer Franks explained to Mr. Davila that he was being released on his own recognizance, and that he would be required to appear in court to face the charge of public intoxication. Mr. Davila indicated that he understood this, and signed the Promise to Appear. | Widen Dec., Ex. 10, Ex. 34 |
| 37. | Officer Franks asked Mr. Davila (again, with Officer Garcia interpreting) if he had any personal property that needed to be returned to him. Mr. Davila said that he did not. Accepting Mr. Davila's answer as true, Officer Franks did not check the property bins to see if Mr. Davila had any property to be returned, and Mr. Davila was released without his wallet, belt, comb or keys. | Widen Dec., Ex. 9, pp. 52-53; Ex. 34 |
| 38. | Mr. Davila was released from jail at approximately 1:21 a.m., on March 5, 2006. | Widen Dec., Ex. 12 |
| 39. | Mr. Davila walked without assistance through a sally port and into the jail's 24-hour lobby. The 24-hour lobby, as its name suggests, was open to the public 24 hours a day. It was a large, clean, temperature-controlled, indoor area with seating, pay phones, vending machines, and restrooms. | Widen Dec., Ex. 12; Ex. 11, pp. 29-31 |
| 40. | The pay phones in the 24-hour lobby could be used by inserting 50 cents to make a local call, or by dialing "0" to call collect. When "0" was dialed, the listener could choose to receive instructions in both English and Spanish on how to make a collect call. | Widen Dec., Ex. 12 |
| 41. | In addition, the 24-hour lobby was staffed with jail personnel who were available to answer any questions Mr. Davila had. Mr. Davila was free to remain in the 24-hour lobby for as long as he wanted or needed, with unlimited access to the facilities there. | Widen Dec., Ex. 11, pp. 29-31 |
| 42. | Rather than remaining in the 24-hour lobby after his release, however, Mr. Davila exited the jail on foot. | Widen Dec., Ex. 12 |

/

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | | |
|---|---|---|
| 1 | 43. A little before 2:00 a.m., San Joaquin County Sheriff's Deputy Andy Coronado was driving in a sheriff's transportation van when he observed Mr. Davila standing on the sidewalk at an intersection in front of the jail. Describing himself as "nosy," Deputy Coronado pulled up to Mr. Davila and asked him in English where he was going. He did not know at that time that Mr. Davila had been released from the jail; he thought Mr. Davila might have been a migrant farm worker. | Widen Dec., Ex. 13, p. 53, l. 24-25; p. 54 |
| 8 | 44. Mr. Davila understood the question and responded in broken English that he was going to Tracy, and pointed in the correct direction. | Widen Dec, Ex. 13, pp. 61-63 |
| 11 | 45. Deputy Coronado, who grew up in a Spanish-speaking household but did not speak fluent Spanish, recognized that English was not Mr. Davila's first language and thereafter communicated with him using a combination of English, broken Spanish, and hand gestures. | Widen Dec., Ex. 13 pp. 57-74 |
| 14 | 46. Deputy Coronado knew a few Spanish phrases, so he next inquired in Spanish where Mr. Davila lived. Mr. Davila again responded "Tracy." Deputy Coronado told Mr. Davila in English that Tracy was a long way to walk, and held up his hands with 10 fingers extended and said "ten miles." Mr. Davila responded that he would be "okay." | Widen Dec., Ex. 13, p. 61 |
| 19 | 47. Deputy Coronado told Mr. Davila he should call for a ride, and at the same time gestured as if he were using a steering wheel. Deputy Coronado reached into his pocket, and took out 50 cents of his own money. He gave it to Mr. Davila, and said "use this." Mr. Davila accepted the money with natural dexterity. Deputy Coronado pointed back towards the jail, and said "telephono." Mr. Davila said "thank you" and reiterated that he would "be okay." Deputy Coronado drove away at that point. | Widen Dec., Ex. 13, pp. 57-74 |
| 26 | 48. Deputy Coronado did not detain Mr. Davila or investigate any further because he had no reason to do so. Deputy Coronado, in addition to being a | Widen Dec., Ex. 13, p. 18, ll. 2-13, pp. 71-74 |

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

9

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

| | |
|---|---|
| sworn peace officer, was also a certified Hospice volunteer who had additional training in talking to elderly, infirm and dying individuals. | |
| 49. Based on his training and experience, he did not perceive Mr. Davila to be in distress, vulnerable, or confused at the time of their encounter. | Widen Dec., Ex. 13, pp. 71-74 |
| 50. Mr. Davila was an adult, he was not breaking any law, and he seemed to know what he was doing. | Widen Dec., Ex. 13, pp. 71-74 |
| 51. Deputy Coronado recalled that the weather was chilly and overcast at the time he spoke with Mr. Davila, but it was not raining; he recalled that he did not have the heat on in his van. | Widen Dec., Ex. 13, pp. 77-78 |
| 52. A jail security videotape suggests that Mr. Davila may have returned to the 24-hour release lobby at approximately 2:00 a.m., and headed toward the pay phones and vending machines before disappearing from the camera's view. | Widen Dec., Ex. 12 |
| 53. It is unknown if Mr. Davila made calls or tried to purchase any food from the vending machine, but no money was found on his person when his body was discovered two days later. | Widen Dec., Ex. 14 |
| 54. Mr. Davila lived in Tracy with his wife, Sophia Davila. Mrs. Davila was out shopping with her daughter, Maylin, at the time of Mr. Davila's arrest on March 4, 2006. When they arrived home from the mall at approximately 8:00 p.m. and discovered that Mr. Davila was not there, they immediately became concerned and went out looking for him. They drove around the streets of Tracy that evening, but did not find him. They did not call any law enforcement agency that evening or even the next morning to report Mr. Davila missing. They waited until 2:00 p.m. the following afternoon, March 5, 2008, before calling the Tracy Police Department, and it was another two hours before a formal missing persons report was filed. | Widen Dec., Ex. 15 |

/

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | | |
|---|---|---|
| 55. | Their explanation was that they did not believe that an adult could be reported missing until he was missing for more than 24-48 hours. | Widen Dec., Ex. 26, p. 42 |
| 56. | The San Joaquin County Sheriff's Office received the missing persons report from the Tracy Police Department at 6:42 p.m., a little over 17 hours after Mr. Davila had been released from jail. The Sheriff's Office immediately launched a comprehensive investigation and search effort. The investigation, conducted over the next two days, included interviews of dozens of witnesses at different locations, ground searches by sheriff's officers and STARS volunteers, aerial searches with two sheriff's helicopters and an airplane, canine tracking, posting bulletins and flyers, distributing a press release, coordinating with other agencies, and alerting citizens in the area using an automatic phone dialing system. Despite this massive, coordinated search effort, Mr. Davila was not located. | Widen Dec., Ex. 15; Ex. 16 |
| 57. | On March 7, 2008, the San Joaquin County Sheriff's Office received a call indicating that a deceased body had been discovered on the site of a commercial poultry farm approximately one mile from the jail. The body, later identified as Mr. Davila's, was discovered between two large buildings on the farm property that housed chickens. There were two occupied residences located on the same property, each within 100 yards of where Mr. Davila's body was found, but no one on the property had seen or heard Mr. Davila until the time his body was discovered. | Widen Dec., Ex. 17 |
| 58. | During the missing persons' investigation, it came to light that Mr. Davila had certain medical problems including Type II Diabetes and high blood pressure. He was taking prescribed medications, but as a Type II diabetic he was not insulin dependent. | Widen Dec., Ex. 21 |
| 59. | Mr. Davila's medical problems were not readily observable. Only plaintiffs and other members of Mr. Davila's family (and his doctors) were aware of them prior to his death. Indeed, Mr. Davila's | Widen Dec., Ex. 20, p. 27 |

11

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | |
|---|---|
| longtime friend and neighbor, Rosario De Leon, never knew that Mr. Davila had diabetes or high blood pressure until Mrs. Davila mentioned it to him after his death. Mr. Davila had never mentioned it. | |
| 60. According to Plaintiffs, Mr. Davila experienced some episodes of forgetfulness and/or confusion in the years prior to his death. During a medical visit on May 21, 2003, Mr. Davila's daughter expressed a concern about possible dementia to his primary care doctor, around the same time his diabetes was first diagnosed. | Widen Dec., Ex. 24, p. 15 |
| 61. His doctor recommended focusing on the more immediate problem of getting Mr. Davila's blood sugar levels under control, and advised they should monitor the dementia symptoms and see if they reoccurred. | Widen Dec., Ex. 24, pp. 15-19 |
| 62. In the following three years, none of Mr. Davila's family members reported any further concerns about dementia during his numerous medical appointments. Mr. Davila was last seen by his doctor just 10 days prior to his arrest, and no symptoms of dementia were reported at that time. | Widen Dec., Ex. 25, pp. 72-73 |
| 63. Mr. Davila was never diagnosed with, evaluated for, or treated for any form of dementia or Alzheimer's Disease. | Widen Dec., Ex. 25, pp. 77-78 |
| 64. Mr. Davila had a sturdy, robust appearance that belied any physical or mental problems. He was 5'1" tall, weighed 186 pounds, and was physically active. | Widen Dec., Ex. 4 (booking photo); Ex. 14; Ex. 22, pp. 36-37, 53; Ex. 15; Ex. 26, pp. 34-35; Ex. 27, pp. 22, 38; Ex. 29, pp. 21-22, 46 |
| 65. He took long, daily walks around his neighborhood and the City of Tracy by himself. He would leave his residence through the side door and be gone for hours at a time, without telling his family where he was going. | Widen Dec., Ex. 22, pp. 36-37, 53; Ex. 15; Ex. 26, pp. 34-35; Ex. 27, pp. 22, 38; Ex. 29, pp. 21-22, 46 |
| 66. They knew that he would sometimes walk along busy 11th Avenue in Tracy to visit the bank and the Save-Mart shopping center, but generally they did not keep track of where he was going when he left the residence. Mr. Davila's neighbors | Widen Dec., Ex. 20, pp. 13, 46-47; Ex. 30, pp. 28-31, 59-60 |

12

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

| | | |
|---|---|---|
| 1 2 | testified that they often saw him walking on the streets by himself, far away from his residence. | |
| 3 4 | 67. He was observed walking on streets as far away as Central Avenue in Tracy, which is over 2 miles from his home. | Widen Dec., Ex. 30, p. 30 |
| 5 6 7 | 68. Plaintiffs never doubted that Mr. Davila could take care of his own health and safety while he was out in public, and they left him alone and unsupervised on a daily basis. | Widen Dec., Ex. 22, pp. 35-37; Ex. 15 |
| 8 | 69. Mr. Davila did not require assistance with his daily living activities. | Widen Dec., Ex. 26, p. 36 |
| 9 10 11 | 70. Plaintiffs did not consider providing him with a medical alert bracelet, or a medical identification card, to protect him in the event he wandered off or became confused in public. | Widen Dec., Ex. 22, p. 29 |
| 12 13 14 | 71. Plaintiffs never had any concerns about Mr. Davila wandering off, getting lost, or becoming disoriented while he was out in public on his long daily walks. | Widen Dec., Ex. 27, pp. 24-26; Ex. 22, p. 37; Ex. 26, pp. 34-36; Ex. 31, pp. 19, 23-25 |
| 15 16 17 18 19 20 | 72. On the day of Mr. Davila's arrest, his wife and daughter left for the mall at approximately 2:00 p.m., knowing that he had walked out of the house alone at least an hour earlier without saying where he was going. They did not return to the house until approximately 8:00 p.m. that evening. It is clear they felt comfortable leaving Mr. Davila alone and unsupervised for long periods of time. | Widen Dec., Ex. 15 |
| 21 22 23 | 73. Mr. Davila's wife describes him as a "rebellious" man, and recalled that he sometimes refused to take his medications and there was nothing anyone could do about it. | Widen Dec., Ex. 22, pp. 32-33 |
| 24 25 | 74. Mr. Davila drank beer frequently, even though he knew his wife did not approve of him doing so, and even though he knew his doctor advised against it. | Widen Dec., Ex. 22, pp. 25, 50-51; Ex. 15 |
| 26 27 28 | 75. Plaintiffs claim that Mr. Davila only drank beer socially and never to excess, but there is other indisputable evidence indicating that Mr. Davila had a history of alcohol abuse. Mr. Davila was arrested | Widen Dec., Ex. 22, p. 38; Ex. 23, pp. 42, 45; Ex. 35 |

13

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

Haapala, Thompson & Abern LLP
Attorneys At Law
Park Plaza Building
1939 Harrison St., Suite 800
Oakland, California 94612
Telephone: 510-763-2324
Facsimile: 510-273-8570

| | | |
|---|---|---|
| | twice for DUI in 1988 and 1989, convicted of a felony, and served three months in jail as a result. | |
| 76. | Mr. Davila's first language was Spanish, which was the language he spoke almost exclusively with his family and friends. However, there is ample evidence that Mr. Davila could also speak, read, write, and understand English, which is not surprising given that he had been living in the United States for over 23 years. | Widen Dec., Ex. 22, pp. 7-8 |
| 77. | Mr. Davila's wife and children testified that he could speak English. | Widen Dec., Ex. 22, pp. 40-42; Ex. 26, p. 38; Ex. 27, pp. 26-27; Ex. 28, pp. 26-30; Ex. 31, p. 25 |
| 78. | He communicated effectively in English with past job supervisors, who were English-only speakers. | Widen Dec., Ex. 28, pp. 26-30 |
| 79. | Mr. Davila's handwriting appears on a lengthy medical history form, demonstrating that he could both read and write in English. | Widen Dec., Ex. 23; Ex. 22, pp. 57-58 |
| 80. | Mr. Davila took and passed the United States citizenship exam, which is administered in English. | Widen Dec., Ex. 22, pp. 8-9 |
| 81. | Mr. Davila read books and magazines written in English. In particular, he enjoyed reading books on television repair and he read the Reader's Digest on a regular basis. | Widen Dec., Ex. 28, pp. 26-30 |
| 82. | Mr. Davila spoke English with his son-in-law (his daughter Maylin's husband) who is not a native Spanish speaker. | Widen Dec., Ex. 26, p. 38 |
| 83. | Correctional Officer Thomas Kendrick and Deputy Andy Coronado both testified that they were able to communicate effectively with Mr. Davila in English and broken Spanish. | Widen Dec., Ex. 3, p. 23; Ex. 13, pp. 46-47 |
| 84. | An autopsy performed by county pathologist George Bolduc, M.D. concluded that Mr. Davila died as a result of a sudden cardiac event caused by chronic, severe atherosclerotic coronary artery disease. | Widen Dec., Ex. 14; Ex. 18, p. 68 |

/

14

*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

| | | |
|---|---|---|
| 85. | Of Mr. Davila's three major arteries, one was 90% blocked, one was 60% blocked, and one was 20% blocked. | Widen Dec., Ex. 14; Ex. 18, p. 81, ll. 15-20 |
| 86. | Dr. Bolduc testified that the presence of marked pulmonary congestion supported the finding that the cardiac event was sudden, as opposed to prolonged. | Widen Dec., Ex. 18, p. 166, ll. 11-21 |
| 87. | Mr. Davila's autopsy also revealed physical evidence consistent with alcoholism, including gynecomastia (enlarged breast tissue), abnormally small testicular size, and fatty metamorphosis of the liver. These were incidental findings and not contributory to the primary cause of death. | Widen Dec., Ex. 18, pp. 71-72, 93-94, 176-178 |
| 88. | Dr. Bolduc testified that there was no reliable forensic evidence suggesting that hypothermia or exposure played a role in causing Mr. Davila's death, primarily because it was impossible to determine precisely how long Mr. Davila had been exposed to the elements prior to the time of his death. | Widen Dec., Ex. 18, p. 101, ll. 8-19 |
| 89. | Dr. Bolduc also ruled out diabetes as the cause of death based on the lack of acetone present in Mr. Davila's blood as reflected in toxicology reports. | Widen Dec., Ex. 18, pp. 162-163 |
| 90. | Dr. Bolduc's cause of death determination is not materially disputed by Plaintiffs. Their retained pathology expert, Terri Haddix, M.D., agreed with Dr. Bolduc's determination that Mr. Davila had died from chronic, severe atherosclerotic coronary artery disease, a natural cause of death. | Widen Dec., Ex. 19, p. 19, ll. 16-25, p. 37 |
| 91. | Dr. Haddix testified that the poor condition of Mr. Davila's heart placed him at risk of having a sudden cardiac event at any time. | Widen Dec., Ex. 19, p. 20, ll. 17-21 |
| 92. | Dr. Haddix also agreed that there was not enough reliable evidence to support the theory that hypothermia caused or significantly contributed to Mr. Davila's death. | Widen Dec., Ex. 19, pp. 26-29 |

/

/

15
*Davila, et al. v. San Joaquin, et al./Case No. 2:06-CV-02691-LKK-EFB*
Title Of Document

| | | |
|---|---|---|
| 93. Dr. Haddix testified that environmental factors such as walking in the cold and shivering could have been additional stressors to his chronically damaged heart. However, she agreed there was no way to determine how long Mr. Davila had been exposed to the elements between the time he left the jail and time his body was discovered one mile away. | | Widen Dec., Ex. 19, pp. 26-29 |

Dated: June 24, 2008

HAAPALA, THOMPSON & ABERN, LLP

By: /s/ Rebecca S. Widen
Rebecca S. Widen
Attorneys For Defendants
COUNTY OF SAN JOAQUIN, ANDY CORONADO, BRIAN FRANKS, LUPE GARCIA, THOMAS KENDRICK, JULIE ANEMA, RONALD ZALUNARDO, and RON COPLIN