UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SOFIA DAVILA; RUBI PASTORA,
JEANETTE ECHEVERRIA;
GUILLERMO DAVILA; MAYRA
SANDOVAL; EDWIN JAVIER
DAVILA; JUAN DAVILA; and
MAYLIN DAVILA,

          NO. CIV. S-06-2691 LKK/EFB

       Plaintiffs,

   v.

COUNTY OF SAN JOAQUIN;         O R D E R
CITY OF TRACY; and DOES
1 through 50,

       Defendants.
_____/

    Plaintiffs Sofia Davila, wife of decedent Guillermo Davila, and his children, have brought the present action alleging that defendants City of Tracy, County of San Joaquin, and Officers Harries, Flores, and Kendrick violated their constitutionally protected familial rights by causing the death of Mr. Davila, which followed his arrest and release from the San Joaquin county jail.[1]

_____

[1] Plaintiffs initially sought damages against other officers Mr. Davila encountered at the San Joaquin county jail, but

1

1  Pending before the court are motions for summary judgment filed by

2  the city and county defendants.  For the reasons explained below,

3  the court grants the city defendants' motion and grants in part and

4  denies in part the county defendants' motion.

**I. Facts**[2]

6  **A. Overview**

7      This case arises from an incident in which plaintiffs'

8  decedent, Mr. Davila, was arrested by Tracy city police officers

9  for public intoxication after he was found in someone else's

10 house.  Mr. Davila was booked at the San Joaquin county jail and

11 taken into custody by the county sheriff's department.  Early

12 the next morning, the county released Mr. Davila, who walked

13 away from the jail on foot.  Two days later, Mr. Davila was

14 found deceased approximately a mile from the jail.  Plaintiffs

15 claim that Mr. Davila died as a result of hypothermia, whereas

16 defendants argue that he died as a result of a sudden cardiac

17 event.  Plaintiffs have brought federal claims under 42 U.S.C. §

18 1983 and state law claims for wrongful death.

19 **B. Arrest by Tracy City Police**

20     On March 4, 2006, at approximately 6:00 p.m., Tracy city

21 police officers Steve Flores and James Harries were each

22 notified by dispatch of a 911 call regarding an intruder in a

---

24 stipulated to dismiss Andy Coronado, Lupe Garcia, Julie Anema, Ron
25 Coplin, Ronald Zalunardo, and Brian Franks after the present
   motions for summary judgment were filed.

26      [2] The facts are undisputed unless otherwise noted.

2

private residence.  Depo. of Steve Flores ("Flores Depo.") at
20-21; Depo. of James Harries ("Harries Depo.") at 80-83.  Upon
arrival, Officers Flores and Harries entered the residence and
approached an upstairs bedroom.  Flores Depo. at 33-34; Harries
Depo. at 90.  Approaching the bedroom, the officers heard loud
screaming or yelling coming from inside.  Flores Depo. at 34;
Harries Depo. at 87-88, 91.

Decedent Guillermo Davila, then 71 years old, was inside
the bedroom, lying on the bed.  Flores Depo. at 41-42.  Officer
Flores observed that Mr. Davila's eyes were glossed over, his
speech was slurred, and that he was unsteady on his feet.  Id.
at 45-46.  Additionally, Officer Flores smelled alcohol on Mr.
Davila.  Id. at 81.

Mr. Davila was unable to communicate with the officers.
Id. at 70.  He was making sounds, in what appeared to be an
attempt to communicate with the officers, but was not speaking
any language that Officer Flores could recognize.  Id. at 70,
73.

Mr. Davila's pants were also neatly set over the arm of the
couch in the living, and his shoes were placed next to them,
indicating to the officers that Mr. Davila believed or was
acting as if it was his house.  Id. at 58.

The officers determined that Mr. Davila was in violation of
California Penal Code sections 602 (trespass) and 647(f) (public
intoxication).  Id. at 66; Harries Depo. at 110.  The officers
considered what action to take and decided to release Mr. Davila

1  to a responsible adult family member.  Flores Depo. at 66-67.

2  Neighborhood children told one of the officers at the scene that

3  they recognized Mr. Davila and directed them to the house where

4  he lived nearby.  Depo. of Miguel Reyna at 24.  The officers

5  located Mr. Davila's home, but no one was there.  Flores Depo.

6  at 65, 83; Harries Depo. at 108.  The officers then decided to

7  arrest Mr. Davila for public intoxication and transported him to

8  the San Joaquin county jail.  Flores Depo. at 83-84; Harries

9  Depo. at 110.

10      At the time of Mr. Davila's arrest, it was the policy of

11  the Tracy police department to follow the penal code with regard

12  to public intoxication offenses.  Depo. of John A. Espinoza

13  ("Espinoza Depo.") at 23.  Officers were instructed that when

14  the elements of the violation were met, officers could place an

15  individual under arrest if they deemed appropriate.  Id. at 23.

16      The Tracy Police Department Field Training Manual contained

17  a directive to officers entitled "persons under the influence."

18  Id. at 29; FTO Guide at 58.  That directive informed officers to

19  be aware of the "officer's options and prosecution criteria."

20  Espinoza Depo. at 29; FTO Guide at 58.  Officers were instructed

21  to discern the degree of intoxication of an individual by

22  observing physical symptoms including the smell of alcohol on an

23  individual's breath or person, the presence of red or watery

24  eyes, an individual's ability to balance, an individual's

25  quality of speech and ability to communicate, and an

26  individual's awareness of his surroundings and orientation.

1  Espinoza Depo. at 30-31.  The purpose of discerning an

2  individual's degree of intoxication was to determine the

3  appropriate level of care the individual required, including

4  when medical attention was appropriate.  Id. at 30, 49, 59.

5  Thus, for example, where the subject was vomiting, urinating on

6  himself, or having convulsions, then immediate medical attention

7  would be appropriate due to possible alcohol poisoning.  Id. at

8  30.

9       The City of Tracy had an additional policy of booking all

10  persons arrested on public intoxication offenses at the San

11  Joaquin county jail and not the city facility.  Id. at 79-80.

12  The county jail had more medical resources available and was

13  better able to monitor and care for intoxicated individuals.

14  Id. at 79-80, 88.

15  **C. Detention at San Joaquin County Jail**

16       Pursuant to the city's policy, the officers delivered Mr.

17  Davila to the San Joaquin county jail at approximately 6:50 p.m.

18  and transferred his custody to the County Sheriff.  Incident

19  Investigation Report, attached as Ex. F to Cassidy Decl.  At

20  approximately 7:30 p.m., defendant Officer Thomas Kendrick began

21  Mr. Davila's pre-book process.  Depo. of Thomas C. Kendrick

22  ("Kendrick Depo.") at 47-48.  Pursuant to the pre-book process,

23  Officer Kendrick submitted Mr. Davila's medical health screening

24  to the on-duty nurse.  Kendrick Depo. at 51.  The questions

25  attached to the screening are phrased so that if any question is

26  answered "yes," an on-duty nurse will review the screening and

5

determine if further attention is required.  Depo. of Ermelinda

Patricio ("Patricio Depo.").  The screening transmitted by

Officer Kendrick indicated that Mr. Davila answered "yes" to a

question regarding whether he had been drinking that day.[3]

Patricio Depo. at 21.  Ms. Patricio, the on-duty nurse, reviewed

the information contained in Mr. Davila's screening and

determined that Mr. Davila required no further attention, given

that there was no notation that he was experiencing withdrawal

or other symptoms of alcohol poisoning.  Patricio Depo. at

40-41.

The questionnaire also contained questions regarding

whether Mr. Davila had diabetes, suffered from heart disease,

was under the care of a physician, or was presently taking any

medications.  Pre-Book Screening of Guillermo Davila, attached

as Ex. 4 to Widen Decl.  The screening indicates that Mr. Davila

answered "no" to all these questions, despite the fact that he

did have diabetes, did suffer heart disease, was under the care

of a physician, and was taking medications.  Pre-Book Screening

of Guillermo Davila.  Mr. De Leon, however, never knew that Mr.

Davila had diabetes or high blood pressure, even though they

spent a great deal of time together and Mr. De Leon himself had

diabetes.  De Leon Depo. at 27.

Pursuant to its policy of processing section 647(f)

---

[3] Mr. Davila's longtime friend and neighbor, Rosario De Leon, stated that he was last with Mr. Davila before 3:00 p.m. and saw him drink one beer.  Depo. of Rosario De Leon ("De Leon Depo.") at 20.  The 911 call regarding an intruder was placed around 6:00 p.m.

1  detainees, Mr. Davila was detained for six hours (in order to
2  provide detainees sufficient time to sober up).  He spent that
3  entire time in the booking lobby.  The booking lobby contains
4  rows of seats, as well as a bank of six telephones for the
5  arrestees' unlimited use, which were free for local calls.
6      Correctional Officer Guadalupe Garcia, a Spanish-speaking
7  officer, had several interactions with Mr. Davila during this
8  time.  Depo. of Guadalupe Garcia at 102-03.  When she first
9  observed that he was out of his seat, she told him in English
10 that he needed to sit down.  He continued to look at her, so she
11 told him more loudly (as she was about fifteen feet away) and in
12 Spanish, "Sir, you need to have a seat."  Id.  He complied
13 immediately.  Id.  On a second occasion, Officer Garcia saw Mr.
14 Davila standing in front of the booking desk; when she told him
15 to please take his seat in Spanish, he responded "okay" and told
16 her in Spanish that he was ready to go home.  She checked his
17 booking information and told him he still had four hours to go.
18 Id. at 109-10.  Approximately two hours later, Mr. Davila
19 inquired again whether he could leave yet, and Officer Garcia
20 told him he had two more hours to go.  Id. at 150-51.  Officer
21 Garcia felt that Mr. Davila's behavior was consistent with the
22 behavior of a cooperative arrestee, and that it was not unusual
23 for arrestees to frequently ask the officers if it was time for
24 them to leave yet.
25 **D. Release from San Joaquin County Jail**
26      Mr. Davila was finally released on his own recognizance at

7

approximately 1:21 a.m.  San Joaquin County Sheriff Documented

Report 06-6645 Supplement No. 26, attached as Ex. 12 to Widen

Decl.  Through a Spanish interpreter, Mr. Davila was asked if he

had any property to be returned.  Depo. of Brian Franks ("Franks

Depo.") at 51-53.  Mr. Davila responded that he had no property

and Officer Franks did not check the property bins to verify.

Franks Depo. at 53.  Mr. Davila did, in fact, have personal

property to be returned, including his wallet.  Franks Depo. at

53.

    Mr. Davila was released from the jail to its "24-hour

lobby."  San Joaquin County Sheriff Documented Report 06-6645

Supplement No. 26.  The lobby is a large, temperature-controlled

indoor area with seating, pay phones, vending machines, and

restrooms.  Id.  At the time, he was wearing pants, a sweater,

and a long-sleeve undershirt.  Id.  Outside, the temperature was

in the 40s.

    Mr. Davila exited the lobby and, a little before 2:00 a.m.,

encountered Deputy Andy Coronado, who was driving in a sheriff's

transportation van on the street outside the jail.  Depo. of

Andrew Coronado ("Coronado Depo.") at 53-54.  Describing himself

as "nosy," Deputy Coronado, who did not know that Mr. Davila had

been released from jail and thought he might have been a migrant

farm worker, asked where Mr. Davila was going.  Mr. Davila told

him that he was going to Tracy and pointed in the correct

direction.  Deputy Coronado told Mr. Davila that Tracy was ten

miles away and a long way to walk; he therefore told Mr. Davila

1  he should call for a ride, gave Mr. Davila fifty cents, and

2  directed him back to the jail's 24-hour lobby to make a phone

3  call.  Id. at 57-74.  A jail security videotape shows that Mr.

4  Davila returned to the 24-hour hobby at approximately 2:00 a.m.[4]

5  but it is unknown whether he made any calls or attempted to

6  purchase food from the vending machine.  San Joaquin County

7  Sheriff Documented Report 06-6645 Supplement No. 26.

8  **E. Cause of Death**

9      On March 7, 2006, Mr. Davila's body was discovered outdoors

10  approximately one mile from the jail.  San Joaquin County

11  Sheriff Documented Report 06-6645 Supplement No. 10, attached as

12  Ex. 17 to Widen Decl.  An autopsy performed by county

13  pathologist George Bolduc, M.D. concluded that Mr. Davila died

14  as a result of a sudden cardiac event caused by chronic, severe

15  atherosclerotic coronary artery disease.[5]  Coroner's Report,

16  attached as Ex. 14 to Widen Decl.  Plaintiffs' expert, Dr. Terri

17  Haddix, stated that she had nothing to refute this

18  determination.  Depo. of Terri Haddix ("Haddix Depo.") at 19.

19  Dr. Haddix stated that someone with a preexisting narrowing of

20  the coronary artery would be more sensitive to the effects of

21  hypothermia.  Haddix Depo. at 24-25.  Neither expert, however,

22

23      [4] Plaintiffs dispute this fact by simply asserting, ipse
24  dixit, that there is no indication on the videotape that Mr. Davila
    reentered the building.

25      [5] Of Mr. Davila's three major arteries, one was 90% blocked,
    one was 60% blocked, and one was 20% blocked.  Depo. of George
26  Bolduc ("Bolduc Depo.") at 81.

1  testified that hypothermia was a likely cause of death.

2      Dr. Bolduc stated in his deposition that, assuming the

3  temperature was in fact in the 40s that night, the weather

4  "would make it likely that hypothermia was a factor in causing -

5  - in pushing his cardiac disease to the point where he suffered

6  a cardiac event and death." Bolduc Depo. at 145. Earlier,

7  however, Dr. Bolduc stated that in order to determine whether

8  hypothermia was a "contributing factor," id. at 121, he would

9  first "have to know how soon . . . did [Mr. Davila] die after

10  leaving the facility," because if it was relatively soon

11  thereafter, the cause of death could have been independent of

12  the weather, id. at 122.[6] He also emphasized throughout his

13  deposition that in order to make a more definite opinion about

14  hypothermia as a contributing factor to Mr. Davila's death, he

15  would need more information such as whether or not Mr. Davila

16  was exposed to rain, the wind chill, and the amount of time that

17  Mr. Davila spent outside. Dr. Haddix agreed that there were

18  many unknown variables that would determine whether Mr. Davila

19  

20      [6] Dr. Bolduc's hesitation to make a firm statement on this
   issue was clear. See Bolduc Depo. at 48 ("Q. Did you make a
21  finding that [] environmental stress factors did push him over the
   edge in terms of his coronary artery disease? . . . A. Well, there
22  are possible stress factors. It's all I can say. I can't say that
   they definitely, you know, triggered the cardiac event, but . . .
23  it's a possibility."); id. at 55 ("All of these things [rain, wind]
   could, if they occurred, could put stress on the heart. This
24  individual has heart disease, a bad coronary, so it could be
   contributory. But I'd have to have more evidence of that."); id.
25  at 115 ("there's certainly indication that he could have . . .
   suffered hypothermia. But as I indicated, I don't have specific
26  or reasonable ballpark numbers to confirm that.").

1  experienced hypothermia.   Haddix Depo. at 26-29.

2                          **II. Standard**

3         Summary judgment is appropriate when it is demonstrated

4  that there exists no genuine issue as to any material fact, and

5  that the moving party is entitled to judgment as a matter of

6  law.   Fed. R. Civ. P. 56(c); <u>see also</u> <u>Adickes v. S.H. Kress &</u>

7  <u>Co.</u>, 398 U.S. 144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51

8  F.3d 848, 853 (9th Cir. 1995).   Under summary judgment practice,

9  the moving party

10        [A]lways bears the initial responsibility of informing
          the district court of the basis for its motion, and
11        identifying those portions of "the pleadings,
          depositions, answers to interrogatories, and
12        admissions on file, together with the affidavits, if
          any," which it believes demonstrate the absence of a
13        genuine issue of material fact.

14
   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).   "[W]here
15
   the nonmoving party will bear the burden of proof at trial on a
16
   dispositive issue, a summary judgment motion may properly be
17
   made in reliance solely on the 'pleadings, depositions, answers
18
   to interrogatories, and admissions on file.'"   <u>Id.</u>   Indeed,
19
   summary judgment should be entered, after adequate time for
20
   discovery and upon motion, against a party who fails to make a
21
   showing sufficient to establish the existence of an element
22
   essential to that party's case, and on which that party will
23
   bear the burden of proof at trial.   <u>See</u> <u>id.</u> at 322.   "[A]
24
   complete failure of proof concerning an essential element of the
25
   nonmoving party's case necessarily renders all other facts
26

immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a

1  reasonable jury could return a verdict for the nonmoving party,

2  Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g

3  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

4       In the endeavor to establish the existence of a factual

5  dispute, the opposing party need not establish a material issue

6  of fact conclusively in its favor.  It is sufficient that "the

7  claimed factual dispute be shown to require a jury or judge to

8  resolve the parties' differing versions of the truth at trial."

9  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

10 809 F.2d at 631.  Thus, the "purpose of summary judgment is to

11 'pierce the pleadings and to assess the proof in order to see

12 whether there is a genuine need for trial.'"  Matsushita, 475

13 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

14 note on 1963 amendments); see also Int'l Union of Bricklayers &

15 Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752

16 F.2d 1401, 1405 (9th Cir. 1985).

17      In resolving the summary judgment motion, the court

18 examines the pleadings, depositions, answers to interrogatories,

19 and admissions on file, together with the affidavits, if any.

20 Rule 56(c); see also In re Citric Acid Litigation, 191 F.3d

21 1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

22 is to be believed, see Anderson, 477 U.S. at 255, and all

23 reasonable inferences that may be drawn from the facts placed

24 before the court must be drawn in favor of the opposing party,

25 see Matsushita, 475 U.S. at 587 (citing United States v.

26 Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also

1   Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,

2   1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

3   out of the air, and it is the opposing party's obligation to

4   produce a factual predicate from which the inference may be

5   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

6   1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

7   Cir. 1987).

8        Finally, to demonstrate a genuine issue, the opposing party

9   "must do more than simply show that there is some metaphysical

10  doubt as to the material facts. . . . Where the record taken as

11  a whole could not lead a rational trier of fact to find for the

12  nonmoving party, there is no 'genuine issue for trial.'"

13  Matsushita, 475 U.S. at 587 (citation omitted).

**III. Analysis**

15  **A. Standing to Bring Federal Claims**

16       As a threshold matter, defendants argue that plaintiffs

17  cannot assert Mr. Davila's constitutional claims for the simple

18  reason that "constitutional claims are personal and cannot be

19  asserted vicariously." Johns v. County of San Diego, 114 F.3d

20  874, 876 (9th Cir. 1997).  The estate of the decedent is not a

21  party to this action, and plaintiffs have not brought this

22  action as personal representatives or successors-in-interest.

23       Nevertheless, plaintiffs may redress violations of their

24  constitutionally protected right to the companionship and

25  society of Mr. Davila pursuant to the Fourteenth Amendment's due

26  process protections.  See Smith v. City of Fontana, 818 F.2d

1411, 1418 (9th Cir. 1987) (recognizing the right of
companionship and society for close family members).  Thus, so
long as the violation of plaintiffs' due process rights (i.e.,
the loss of Mr. Davila's companionship and society) was
proximately caused by violations of Mr. Davila's own
constitutional rights, plaintiffs may properly assert those
latter violations in pursing their own constitutional claims.

Indeed, the approach urged by defendant has been expressly
rejected by Ninth Circuit.  In Ward v. City of San Jose, 967
F.2d 280, 284 (9th Cir. 1991), the Ninth Circuit rejected the
requirement, adopted by the Tenth Circuit in Trujillo v. Board
of County Commissioners, 768 F.2d 1186 (10th Cir. 1985), that
family members must "prove a wrongful intent directed
specifically at them."  See also Sherrod v. Berry, 827 F. 2d
195, 207-08 (7th Cir. 1987) (rejecting Trujillo).  That said,
plaintiffs must still prove that government officials acted with
deliberate indifference to their familial rights.  Lee v. City
of Los Angeles, 250 F.3d 668, 685-86 (9th Cir. 2001); Byrd v.
Guess, 137 F.3d 1126, 1134 (9th Cir. 1998) ("to prove their
Fourteenth Amendment claim, [plaintiffs] had to prove that the
Officers acted with deliberate indifference to [their] rights of
familial relationship.").  Accordingly, the court finds that
plaintiffs have standing to assert their own Fourteenth
Amendment claims.

**B. City Defendants**

As noted above, it was the city defendants who arrested Mr.

1  Davila and transported him to the jail, whereas it was the

2  county defendants who were responsible for Mr. Davila during his

3  detention and who made the decision to release him.  The court

4  therefore analyzes their liabilities separately.

5      **1. Federal Claims**

6          **a. Officers Harries and Flores**

7      Plaintiffs contend that Officers Harries and Flores (the

8  officers who found and arrested Mr. Davila) were deliberately

9  indifferent to Mr. Davila's serious medical needs by arresting

10  him and taking him to the county jail instead of directly to a

11  medical facility.  A prisoner's right not to have officials

12  remain deliberately indifferent to his serious medical needs

13  usually stems from the Eighth Amendment's bar on cruel and

14  unusual punishment.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).

15  When the individual alleging deliberate indifference is merely a

16  detainee and has not been convicted of any crime, however, that

17  right stems instead from the Fourteenth Amendment's due process

18  clause.  <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1187 (9th

19  Cir. 2002).

20      Plaintiffs contend that the officers must have known from

21  the fact that Mr. Davila was unable to communicate that he was

22  in serious need of medical attention and that the county jail

23  would be unable to attend to that need.  Plaintiffs further

24  reason that had Mr. Davila been taken into a medical facility

25  rather than the jail, he would not have been released from the

26  jail at 1:20 a.m. into adverse weather conditions.

1    As an initial matter, plaintiffs have tendered no evidence

2  as to what medical or mental condition would have caused Mr.

3  Davila to be unable to communicate and that the officers should

4  have reasonably recognized.  Equally important, there is no

5  evidence that this undefined medical or mental condition was

6  linked to either of the possible causes of death (hypothermia or

7  a sudden cardiac event).[7]  The fact that a trip to the hospital

8  to treat an unrelated medical condition would have fortuitously

9  put him in a different location at 1:20 a.m. on March 5, 2008 is

10  not sufficient to establish proximate causation.[8]  Benefiel v.

11  Exxon Corp., 959 F.2d 805, 807 (9th Cir. 1992) ("[A] plaintiff

12  must do more than merely demonstrate that 'defendant's action

13  triggered a series of other events that led to the alleged

14  injury'").  If, for example, Mr. Davila had his broken arm, but

15  the officers ignored this fact and instead transported him to

16  the jail rather than a hospital, their action would not be the

17  legal cause of a hypothermia-induced death the next day.

18    Moreover, no reasonable jury could conclude that, based on

19  the actions that Officers Harries and Flories took, they

20  knowingly disregarded an excessive risk to Mr. Davila's safety.

21  The record reflects that Officers Harries and Flores did in fact

---

23    [7] Assuming, for example, that Mr. Davila had had a stroke,
    which caused him to temporarily lose the ability to communicate --
24  a possibility that plaintiffs have not argued in their briefs --
    this would not necessarily have been related to his ultimate cause
25  of death.  See Bolduc Depo. 85-86.

26    [8] The medical causation issues are addressed further below.

17

1  consider the risks faced by Mr. Davila when deciding the proper
2  course of action.  Flores Depo. at 66-67.  The officers first
3  attempted to take Mr. Davila home and leave him in the care of a
4  responsible adult.  Id.  Only after determining that no one was
5  home to receive him did the officers place Mr. Davila under
6  arrest and transport him to the county jail.  Id. at 83-84;
7  Harris Depo. at 110.

8       Pursuant to city policy, the officers brought Mr. Davila to
9  the county facility because the city jail did not have the
10 resources available to monitor the medical needs of intoxicated
11 individuals.  Espinoza Depo. at 79-80, 88.  Indeed, it is not
12 unreasonable to suppose that if Mr. Davila was in need of
13 medical attention, that determination was more likely to have
14 been made by the medical staff at the county jail than at the
15 city jail.

16      The undisputed facts also show that the officers did not
17 observe Mr. Davila blacking out, unconscious, falling down,
18 bleeding, vomiting, or having urinated on himself.  Instead,
19 they observed that Mr. Davila had bloodshot eyes, unsteady gait,
20 and the odor of alcohol on his person.  In other words, Mr.
21 Davila appeared intoxicated -- but there was no indication of
22 alcohol poisoning.  Particularly where the officers took the
23 action of transporting Mr. Davila to a facility equipped to
24 monitor the medical needs of intoxicated individuals, it would
25 be unreasonable for a jury to conclude that the officers were
26 deliberately indifferent to an excessive risk of harm.

1  Accordingly, Officers Harries and Flores are entitled to summary

2  judgment on plaintiffs' § 1983 claim.

3          **b. City of Tracy**

4          Municipalities may be held liable pursuant to § 1983 where:

5  (1) an individual suffers a constitutional injury; (2) defendant

6  municipality has a custom or policy that amounts to deliberate

7  indifference to that individual's constitutional rights; and (3)

8  the custom or policy is the driving force behind the violation.

9  Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing

10 City of Canton v. Harris, 489 U.S. 378, 389-91 (1989)).  Because

11 plaintiffs cannot satisfy the first element, the city likewise

12 cannot be held liable.[9]  See City of Los Angeles v. Heller, 475

13 U.S. 796, 799 (1986) (stating that no authority "authorizes the

14 award of damages against a municipal corporation based on the

15 actions of one of its officers when [it has been] concluded that

16 the officer inflicted no constitutional harm").  Accordingly,

17 the City of Tracy is entitled to summary judgment.

18          **2. State Claims**

19          Plaintiffs also assert state law negligence claims against

20 Officers Flores and Harries.[10]  In addition, plaintiffs argue

21 _____

22          [9] Plaintiffs' claim that the city follows an inexorable rule
   of booking anyone arrested for public intoxication into jail,

23 without the possibility of seeking medical treatment, is without
   foundation.  In fact, plaintiffs admit at one point in their brief

24 that "officers may consider" seeking such medical treatment.  Pls.'
   Opp'n at 18.

25          [10] Despite the court's grant of summary judgment as to Officer

26 Flores and Harries and the City of Tracy on plaintiffs' federal
   claims, the court retains pendent party jurisdiction over the state

1  that the city itself may be held liable based upon respondeat

2  superior liability.  The same proximate causation problems

3  inherent in plaintiffs' federal claims are equally fatal to

4  plaintiffs' state law claims.  As noted above, the failure to

5  take Mr. Davila to the hospital for a purported medical

6  condition unrelated to his actual cause of death cannot serve as

7  the basis for a tort (constitutional or otherwise).

8      Moreover, plaintiffs' claims are barred by the immunity for

9  discretionary decisions conferred by California Government Code

10  section 820.2, which provides that "a public employee is not

11  liable for an injury resulting from his act or omission where

12  the act or omission was the result of the discretion vested in

13  him."  Plaintiffs respond that the decision to take Mr. Davila

14  to jail and not to the hospital was not a discretionary one, but

15  rather was a ministerial act made in accordance with city

16  policy.  Plaintiff's contention belies the facts surrounding Mr.

17  Davila's arrest and the city's policy.

18      Officer Flores asserts that when the officers encountered

19  Mr. Davila, they considered what was the best course of action

20  _____

21  law claims against these same defendants.  See 28 U.S.C. § 1367(a)
   ("district courts shall have supplemental jurisdiction over all

22  other claims that are so related to the claims in the action within
   such original jurisdiction that they form part of the same case or

23  controversy under Article III of the United States Constitution");
   Briarpatch Ltd. L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308

24  (2d Cir. 2004) (noting that a state law claim forms part of the
   controversy if it and the federal claim derive from a common

25  nucleus of operative fact, "even if the state law claim is asserted
   against a party different from the one named in the federal

26  claim.").  As noted below, plaintiffs' federal claim against
   Officer Kendrick and the county may proceed.

1  to take.  Flores Depo. at 66-67.  Their initial decision was to

2  leave Mr. Davila with a responsible family member who could care

3  for him if such a family member could be found.  Id.  To that

4  end, the officers went to Mr. Davila's residence but found no

5  one home.  Id. at 65, 83; Harries Depo. at 108.  It was only at

6  that point that the officers chose to take Mr. Davila to the San

7  Joaquin County Jail.  Flores Depo. at 83-84; Harries Depo. at

8  110.

9      The decision made by the officers was based upon the

10  information that was available to them and included their own

11  physical observations of Mr. Davila.  Flores Depo. at 97;

12  Harries Depo. at 108.  As such, it was made pursuant to and in

13  accordance with the city's policy for treating individuals

14  suspected of being intoxicated.  Espinoza Depo. at 23-24.

15      The actions of the officers cannot reasonably be construed

16  as ministerial.  They balanced the facts and options known to

17  them and made a decision about how to best care for Mr. Davila.

18  The plaintiffs are correct in asserting that California has not

19  established a clear guideline for what may be properly labeled

20  "discretionary" under section 820.2.  See Burgdorf v. Fender,

21  246 Cal. App. 2d. 443, 449 (1996).  But, in this instance, there

22  can be no doubt that the actions of the officers were

23  discretionary and that a reasonable jury could not conclude

24  otherwise.  Accordingly, the individual officers are entitled to

25  immunity from plaintiffs' state law negligence claims.

26      As Officers Harries and Flores are entitled to immunity,

1  the City of Tracy is likewise immune.  See Cal. Gov. Code §

2  815.2(a) ("A public entity is liable for injury proximately

3  caused by an act or omission of an employee of the public entity

4  within the scope of his employment").  Accordingly, Officers

5  Harries, Flores, and the City of Tracy are entitled to summary

6  judgment on plaintiffs' state law claims.

7  **C. County Defendants**

8      **1. Federal Claims**

9          **a. Officer Kendrick**

10         Plaintiffs contend that Officer Kendrick was deliberately

11 indifferent to Mr. Davila's serious medical needs by failing to

12 perform a mandated medical screening.  Despite the documented

13 evidence that Officer Kendrick submitted a completed medical

14 questionnaire for Mr. Davila, plaintiffs assert that there is

15 circumstantial evidence to suggest that Officer Kendrick

16 submitted the questionnaire without ever asking the questions it

17 contained.

18         Drawing all reasonable inferences in favor of plaintiffs'

19 at the time of his arrest (approximately 6:00 p.m.), Mr. Davila

20 was unable to form words or communicate with the arresting

21 officers.[11]  Flores Depo. at 70, 73.  It is also undisputed that,

22 two hours into his detention at the jail, he was able to speak

23 with Officer Garcia, as evidenced by his inquiry into when he

24 _____

25     [11] It would also be reasonable to infer that the unsuccessful
    attempts to verbally communicate with Mr. Davila could be explained
26 by other reasons, such as refusal or unwillingness to communicate,
    language barriers, or simply the result of being intoxicated.

1  would be permitted to leave.  Thus, it is clear that at some

2  point during the evening, Mr. Davila regained his ability to

3  communicate (assuming, of course, that he had lost it in the

4  first place).  What is unclear, however, is at what point that

5  happened.

6      Plaintiffs argue that the fact that many of the responses

7  purportedly provided by Mr. Davila are incorrect creates the

8  inference that the questions were never asked.  Defendants

9  respond that patients often deny having medical conditions to

10  jail staff because they do not wish to reveal their health

11  status to a stranger.  Depo. of James C. Sida at 28-29.  In

12  addition, defendants contend that Mr. Davila never revealed to

13  his own friend that he suffered from diabetes or had high blood

14  pressure, indicating that concealment of medical conditions was

15  not uncommon for Mr. Davila.  De Leon Depo. at 27.

16      The court is obliged to draw all reasonable inferences

17  based on the evidence submitted in favor of the nonmoving party.

18  Matsushita, 475 U.S. at 587.  It would not be unreasonable for a

19  jury to infer that because plaintiff apparently was unable to

20  communicate when he was first booked, and many of the answers

21  recorded in Mr. Davila's medical questionnaire are wrong, the

22  questions were never posed.  As such, it appears that the

23  plaintiffs have shown that a genuine issue of fact exists with

24  regard to the whether the medical screening purportedly

25  conducted by Officer Kendrick was in fact performed.

26      The dispute is material because if the medical screening

1  had been performed, and if Mr. Davila had answered the questions

2  honestly, it is at least possible that this information would

3  have (or should have) changed the county's decision to release

4  Mr. Davila in light of the weather conditions and/or without

5  first determining that Mr. Davila had secured transportation (or

6  had secured such transportation on his behalf).  A jury could

7  therefore reasonably conclude that Kendrick violated Mr.

8  Davila's rights to personal security under the Fourteenth

9  Amendment (and, by extension, plaintiffs' rights to his

10  companionship and society).  Redman v. County of San Diego, 942

11  F.2d 1435, 1439 (9th Cir. 1991).

### b. San Joaquin County

13      As noted above, there is a genuine dispute as to whether

14  Mr. Davila suffered a constitutional injury at the hands of

15  Officer Kendrick.  While the county may not be held liable for

16  Kendrick's alleged failure to ask the medical screening

17  questions (because such a failure would not have been in accord

18  with county custom or policy), a reasonable jury could hold the

19  county liable for its policy of releasing individuals with a

20  history of medical problems, such as heart disease, into

21  inclement weather conditions without first determining that

22  transportation had been arranged or was available.[12]  While both

23

24      [12] The county did have in place prohibitions on the release of
detainees who had sufficiently serious medical or psychological

25  issues or were still under the influence of drugs or alcohol.
Depo. of Janet Allen at 35.  With regard to the first category, the

26  county's policy did not take into account the effect of weather on
a detainee's medical condition.  With regard to the second

Kendrick and the county would share liability, a reasonable jury
could nevertheless conclude that the county's policy was "'so
closely related as to be the moving force causing the ultimate
injury.'"   Oviatt, 954 F.2d at 1481.

Plaintiffs also argue that the county should be held liable
on other bases, such as the failure to instruct detainees that
they are free to stay in the 24-hour lobby as long as they wish.
Because Mr. Davila *voluntarily* chose to leave the 24-hour lobby
(even after his exchange with Deputy Coronado),[13] however, the
only theory of liability on which plaintiffs may proceed is that
the county should have *involuntarily* detained Mr. Davila.  See
Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996)
(holding that the Ninth Circuit has looked to "[t]raditional
tort law" to define "intervening causes that break the chain of
proximate causation" in § 1983 actions).  The Supreme Court has

_____

category, there is insufficient evidence from which a reasonable
jury could infer that Mr. Davila was still so intoxicated at the
time of his release (approximately seven hours after Officers
Harries and Flores encountered Mr. Davila) that he should have been
detained on this basis.

[13] This fact distinguishes the present case from others in
which the state affirmatively placed the plaintiff in a position
of danger, without any means of avoiding the danger.  In Wood v.
Ostrander, 879 F.2d 583 (9th Cir. 1989), for example, the officers
arrested a female driver for drunk driving and impounded her
vehicle, leaving her on the side of the road in a high crime area.
She accepted a ride from a stranger, who drove to a secluded area
and raped her.  Similarly distinguishable is Munger v. City of
Glasgow Police Dep't, 227 F.3d 1082 (9th Cir. 2000), in which
police officers ejected an intoxicated patron from a bar, wearing
only a t-shirt and jeans, into a 20-25 degree weather.  Here,
plaintiff was in a safe and secure location, but voluntarily chose
to leave it.

noted that in "virtually every instance where a person has had
his or her constitutional rights violated by a [municipal]
employee, a § 1983 plaintiff will be able to point to something
the city 'could have done' to prevent the unfortunate incident."
City of Canton, 489 U.S. at 392.  Accordingly, the court grants
in part and denies in part the county's motion for summary
judgment with respect to plaintiffs' federal claims.

**2. State Law Claims**

Assuming that Kendrick in fact failed to conduct the
medical screening, a jury could find both him and the county
liable for this omission under state law.  California Government
Code section 844.6 establishes the general rule that "a public
entity is not liable for . . . an injury to any prisoner," but
it creates several exceptions, including where liability is
created under section 845.6.  That latter section creates
liability against both the public employee and public entity
where "the employee knows or has reason to know that the
prisoner is in need of immediate medical care and he fails to
take reasonable action to summon such medical care."[14]  Thus, to
the extent that Kendrick is liable under state law, San Joaquin
County is also liable under state law.  See also Cal. Gov't Code
§ 815.2 ("a public entity is liable for injury proximately
caused by an act or omission of an employee of the public entity

---

[14] Kendrick may have summoned medical care (i.e., the nurse),
but a jury might infer that he did not take "reasonable action" to
summon medical care in light of the alleged failure to conduct the
medical screening.

1  within the scope of his employment . . .").

2       With respect to any other grounds for a state law claim,

3  the county argues it would be barred by section 844.6 immunity

4  for injuries to prisoners.[15]   The question is whether Mr. Davila

5  was still a prisoner while the putative wrongful conduct

6  occurred.   To the extent that plaintiffs argue that the county

7  should have involuntarily detained Mr. Davila (even after the 6-

8  hour period had expired) before releasing him, that conduct (or,

9  more precisely, that omission of conduct) would have occurred

10  while Mr. Davila was still a prisoner.   Accordingly, the

11  immunity would still apply.

12       To the extent that plaintiffs argue that the county should

13  have taken additional steps after his release, such as expressly

14  communicating to him that he could stay in the 24-hour lobby,

15  the interaction between Mr. Davila and Deputy Coronado, and Mr.

16  Davila's apparent voluntary choice to leave the lobby after

17  reentering it, breaks the chain of causation for any of the

18

19  _____

20       [15]   The court declines to find immunity on the alternate
    grounds urged by the county, California Government Code section

21  845.8, which provides that "neither a public entity nor a public
    employee is liable for (a) any injury resulting from the

22  determining whether to parole or release a prisoner or from
    determining the terms and conditions of his parole or release."

23  See also Ladd v. County of San Mateo, 12 Cal. 4th 913 (1996)
    (immunity extends to injuries inflicted by the prisoner himself).

24  The text of this provision suggest that it was intended to immunize
    municipalities from injuries caused by recidivist parolees and

25  released prisoners.   The court is unpersuaded that this immunity
    pertaining to the "conditions of . . . release" should be read so

26  literally as to encompass, for example, the weather conditions at
    the time of release.

1  county's alleged misconduct.[16]  Finally, once the county released

2  Mr. Davila, their duty to him also ended, and plaintiffs' have

3  not pointed to an alternate basis for statutory liability.  Cal.

4  Gov't Code § 815 ("Except as otherwise provided by statute . . .

5  [a] public entity is not liable for an injury.").

6      Accordingly, the court finds that the county may only be

7  held liable on the state law claims, if at all, based on Officer

8  Kendrick's liability.

9  **C. Medical Causation**

10     For any claim to proceed against either Office Kendrick or

11  the county, plaintiffs must also show a genuine dispute that the

12  actions of defendants caused the alleged injuries to plaintiffs

13  and to Mr. Davila.  Phillips v. Hust, 477 F.3d 1070, 1077 (9th

14  Cir. 2007) (detailing the causation requirements of a § 1983

15  claim); Jones v. Ortho Pharm. Corp., 163 Cal. App. 3d 396, 460-

16  61 (1985) (detailing the causation requirements of California

17  negligence claim).

18     As noted above, Dr. Bolduc stated in his deposition that,

19  assuming the temperature was in fact in the 40s that night, the

20  weather "would make it likely that hypothermia was a factor in

21  causing -- in pushing his cardiac disease to the point where he

22  suffered a cardiac event and death."  Bolduc Depo. at 145.

23  ────────────────

24  [16] Moreover, that the county did not expressly tell Mr. Davila
    at the time of release that he could stay in the lobby is clearly
25  a discretionary policy decision, rather than, as plaintiff
    characterizes it, a ministerial implementation of a policy.  The
26  county would therefore also be entitled to discretionary immunity
    under section 820.2.

1   While he was far more equivocal at other points in his

2   deposition -- noting that he would also need to know whether it

3   was raining, what the wind chill was, and how much time Mr.

4   Davila had spent outside before reaching a firm conclusion --

5   this particular statement is sufficient to create a genuine

6   dispute that the cold weather was "likely" a factor in causing

7   Mr. Davila to suffer a cardiac event.[17]   Accordingly, the court

8   finds there is a genuine dispute as to whether Mr. Davila's

9   exposure to the elements was a substantial factor in causing his

10  cardiac event.

11                         **IV. Conclusion**

12      For the reasons set forth above, defendants Flores,

13  Harries, and the City of Tracy's motion for summary judgment

14  (Dock. No. 63) is GRANTED in full.  Defendant Kendrick and San

15  Joaquin County's motion for summary judgment (Dock. No. 60) is

16  GRANTED in part and DENIED in part.

17      IT IS SO ORDERED.

18      DATED:  August 20, 2008.

19

20                                  _____
                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
21                                  UNITED STATES DISTRICT COURT

---

22      [17] It is noteworthy that plaintiffs' original theory of
    liability was that Mr. Davila died of hypothermia, and his heart
23  disease made him more prone to hypothermia, rather than the
    reverse: that Mr. Davila's exposure to cold temperatures was a
24  substantial factor in causing the cardiac event.  With regard to
    the former theory, plaintiffs have not put forward sufficient
25  evidence to create a genuine dispute. Not even plaintiffs' expert,
    Dr. Haddix, was willing to opine that Mr. Davila's likely cause of
26  death was hypothermia based on the information available.